# GROUP EXHIBIT B

# EXHIBIT B - 1

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| ROBERT MARTIN and KRISTIN ARMSTRONG individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br><br>GLOBAL MARKETING RESEARCH SERVICES, INC., a Florida corporation,<br><br>*Defendant*. | Case No. 6:14-cv-1290-ORL-31-KRS |

### DECLARATION OF ATTORNEY STEVEN L. WOODROW IN SUPPORT OF MOTION FOR AN AWARD OF REASONABLE ATTORNEYS' FEES AND FOR REIMBURSEMENT OF EXPENSES

I, Steven L. Woodrow, on oath declare as follows:

1.      I am a partner with the law firm of Woodrow & Peluso LLC. I am one of the attorneys in the above-captioned matter who was appointed as Settlement Class Counsel. I am over the age of 18 and can competently testify to the matters set forth below.

***Nature of the Case and Early Litigation***

2.      The original named Plaintiff, Melanie Walsh, received GMRS's survey calls on her cellphone. Prior to simply filing a complaint, my co-counsel, Stefan Coleman, performed an exhaustive investigation into GMRS. This involved not only reviewing public information available from the Internet and other sources but also numerous telephone interviews with over a dozen people who claim they had been contacted on their phones by GMRS. Through these interviews and the investigation more broadly, Class Counsel was able to determine that the calls were likely being made with automatic dialing equipment and that the calls were made without any prior relationship or consent from the person being called.

3.      Given the apparent facts, Class Counsel filed the initial Complaint on August 11, 2014. The initial Complaint alleged that GMRS's calls violated the TCPA with respect to Walsh and a nationwide class of all similarly situated consumers. Counsel thereafter effectuated service and GMRS appeared. Following brief settlement discussions, it appeared that GMRS was not willing to settle the case on a class basis.

4.      Instead, on October 10, 2014 GMRS filed a Motion to Dismiss, which was fully briefed by the Parties and was denied by the Court on December 16, 2014 (Dkt. 16). On January 23, 2015, GMRS filed a "renewed" motion to strike (Dkt. 32) and Class Counsel began drafting response papers, but the Court denied GMRS's "renewed" motion just 3 days after it was filed (January 26, 2016). (Dkt. 33.)

5.      Following the Court's Order denying GMRS's Motion to Dismiss, Plaintiff propounded discovery on GMRS, including document requests and written interrogatories, on December 23, 2014. GMRS responded to Plaintiff's interrogatories on January 30, 2015, and to Plaintiff's requests to produce on February 2, 2015. GMRS's answers were, in Class Counsel's opinion, evasive and non-responsive, which resulted in counsel engaging in a series of discovery meet and confers and subsequent requests from GMRS for information. Numerous phone calls and emails were exchanged between counsel for the Parties during this time in an attempt to resolve the discovery disputes.

***The First Full Mediation Session with Rodney Max***

6.      During a meet and confer on February 12, 2015, counsel for the Parties, in addition to discussing the discovery responses, discussed the potential for settlement when Mr. Schwartz asked whether a settlement could be achieved. Class Counsel indicated that the case should settle and walked Mr. Schwartz through what a potential settlement might look like.

2

7.      A week later, on February 18, 2015, I drafted and sent a letter to Mr. Schwartz setting forth two alternative settlement "frameworks" that could be used to resolve the case. Following this letter, counsel for the parties traded a handful of emails clarifying the alternative models and approaches and discussing the particulars of each.

8.      On March 10, 2015, counsel for the Parties engaged in telephone call to further discuss and flesh out the settlement proposal. During this call, GMRS's lawyer indicated that GMRS was interested in a traditional class settlement, and counsel thereafter discussed in detail what a traditional class action settlement would likely feature. Counsel also exchanged additional settlement emails.

9.      The Parties agreed to attempt to resolve the case through private mediation. GMRS proposed that the Parties mediate with Terrence White. Class Counsel suggested Rodney Max, and GMRS's counsel thereafter indicated that GMRS was in agreement and that Rodney Max would be used. Despite this agreement, GMRS filed a notice of mediation indicating that Terrence White would be the mediator. (Dkt. 34.) When Class Counsel asked when GMRS's counsel would switch the mediator without notifying Class Counsel of the change, GMRS's counsel responded that he did not think it mattered. Class Counsel indicated that it of course mattered, as the Parties had previously discussed it and had agreed on Rodney Max. Ultimately GMRS's relented and filed a revised notice naming Rodney Max as the mediator. This is one of many irregularities that occurred throughout the life of the case.

10.     The Parties scheduled a full day, in-person mediation session held on April 22, 2015 in Boca Raton, Florida with Mr. Max. The negotiations were extensive and substantial information was provided regarding the calls that GMRS made (including the number of calls, the manner by which GMRS claimed it obtained consent to make the calls, the state-by-state

breakdowns of the calls, and the purpose of the calls). Ultimately, the Parties were unable to reach an agreement on a settlement framework or the relief to be made available to the Class (or, in fact, which group of called persons to include in any settlement).

11.     The mediation was helpful in that it helped each side understand the other side's perspective and views regarding the evaluation of the case, the exposure faced, and the key questions pending in the litigation that needed to be resolved for settlement talks to reconvene. It also helped confirm that GMRS would be insolvent if faced with any meaningful judgment in the case.

12.     On May 26, 2015, the mediator, Mr. Max, filed a notice with the Court declaring an impasse.

*A Flurry of Litigation Between the First and Second Mediation Sessions*

13.     Following the first mediation, Class Counsel set out to gather through the discovery process the information relevant to the issues that GMRS had indicated at the mediation would need to be resolved before it were to settle on a class basis on terms at or near what the Plaintiff's had demanded at the mediation.

14.     This included filing a motion for leave to amend the Complaint in the Florida action to replace Ms. Walsh as the named plaintiff. Ms. Walsh indicated that she could not devote the time necessary to the case and thus needed to be substituted for other consumers who were willing to devote the time. Fortunately, from Stefan Coleman's pre-suit investigation and our continued efforts speaking with potential class members throughout the litigation we were able to secure two replacement plaintiffs, Robert Martin and Kristin Armstrong.

15.     GMRS objected to producing discovery regarding any surveys that it had conducted in states other than North Carolina, where Ms. Walsh had resided. Following the substitution of Plaintiffs, GMRS continued to object to producing in discovery any information

4

regarding surveys conducted in states other than the states where Martin and Armstrong reside. These objections ultimately lead to Plaintiffs' first and second motions to compel.

16.     Prior to that, however, on June 4, 2015, a different cellphone user, Nicole Zilveti, filed a case against GMRS in the Northern District of California styled *Zilveti v. Global Marketing Research Services, Inc.*, 3:15-cv-02494-KAW. On July 22, 2015, GMRS moved to dismiss or transfer the *Zilveti* case to this Court, which was denied on February 16, 2016. The *Zilveti* matter has been stayed pending this Court's approval of the Settlement.

17.     Likewise, on June 25, 2015, another consumer, Alicia Thompson, filed a case in the Eastern District of Pennsylvania against GMRS styled *Thompson v. Global Marketing Research Services, Inc.*, 2:15-cv-03576-AB, seeking certification of a Pennsylvania-only Class. GMRS filed a motion to dismiss or transfer in the *Thompson* case on July 31, 2015, which was granted on January 20, 2016 and re-assigned as case no. 6:16-cv-306-Orl-31DAB following transfer to the Middle District of Florida.

18.     All three cases allege that GMRS's political calls to consumer cellphones were made without prior express consent in violation of the TCPA, and the Amended Complaint filed in the instant case specifically carved out the States of California and Pennsylvania from the class definition. The Class Definition in the Settlement Agreement, as embodied in the Court's Preliminary Approval Order, covers all three cases.

19.     As all three case dockets show, the litigation was extensive. Since the Florida Action was filed, GMRS and the named Plaintiffs have engaged in written discovery (including exchanging answers to interrogatories, requests to produce documents, requests for admission, and initial disclosures) and have also exchanged information through informal discovery. GMRS moved to have the *Thompson* and *Zilveti* matters transferred to this Court and also filed a Motion

to Reconsider and for Sanctions in the instant case against Plaintiffs and Class Counsel relating to the Amended Complaint. Those motions were fully briefed, as were several additional motions and pleadings.

20.     Indeed, the instant (Florida) action alone the Parties have briefed and litigated, among other filings, a motion to dismiss (dkt. 16), two motions to compel further answers to discovery (dkts. 49, 64), GMRS's Motion for a Protective Order (dkt. 66), GMRS's Motion to Reconsider the Court's granting of Plaintiff's Motion for Leave to File an Amended Complaint and for Sanctions (dkt. 66), a motion for sanctions against GMRS (dkt. 61), a motion for oral argument (dkt. 67) and Reconsideration of the Court's Order denying oral argument, (dkt. 81) and a motion to reconsider the Court's denial of the Parties' joint motion for an enlargement of time (dkt. 90). (*Id*. ¶ 14.)

21.     And in the *Zilveti* and *Thompson* actions, the Parties fully briefed GMRS's motions to dismiss or transfer. This discovery and briefing is on top of the hundreds of emails exchanged and teleconferences between counsel for the Parties and between counsel and the Department of Justice (related to its intervention in the *Zilveti* and *Thompson* cases). Put simply, in addition to the Parties' settlement negotiations (discussed below) the Parties vigorously litigated the case both prior to and following the first mediation session.

***The Court* Grants Plaintiffs' Second Motion to Compel, GMRS Requests a Return to *Mediation, and the Parties Engage in a Second Full-Day Mediation Session in Florida.***

22.     The Parties thereafter worked to satisfy their meet and confer obligations, and Plaintiff filed a Second Motion to Compel further answers to discovery in this case.

23.     On October 15, 2015, the Court entered Orders Denying GMRS's request for a protective order and granting in large part Plaintiffs' Second Motion to Compel. (Dkt. 84.) On

October 13, 2015, GMRS's counsel reached out regarding the possibility of returning to mediation.

24.     I flew to Orlando a week later to engage in a second full-day mediation session with Rod Max on October 20, 2015. The Parties made significant progress during this second mediation session regarding a class settlement. Although the Parties didn't reach an agreement regarding the relief to be made available to the class, progress was made such that it made sense to continue pursuing the negotiations in earnest.

25.     Over the course of the several weeks (which grew into months, despite Class Counsel's best efforts), counsel for the Parties continued with the help of the mediator to negotiate the terms of the relief to be made available to the Settlement Class Members and the Settlement's other key terms. This included back-and-forth negotiations regarding multiple terms of the agreement, including the relief to the class, the definition of the class, the scope of the notice and who should bear its costs, and a litany of other issues. The Parties were closing in on an agreement when GMRS revealed that potential additional insurance existed.

***At the Last Minute,*** **GMRS "Discovers" Two Potential Years Worth of Additional Insurance**

26.     At the start of the mediation process, GMRS indicated that it only had $4,000,000 in potential insurance. This changed at the first mediation session when GMRS revealed that it actually had $6,000,000 in potential insurance. From the first mediation session throughout nearly all of 2015, Plaintiffs proceeded on the understanding that $6,000,000 was available, and nothing more.

27.     In early January 2016, however, as the Parties were nearing an agreement, GMRS's counsel disclosed to Class Counsel for the first time that potential additional insurance coverage existed under policies issued by Mapfre Insurance Company of Florida ("Mapfre").

28.    The Parties thereafter jointly requested additional time from this Court to continue their negotiations to seek to include Mapfre, which the Court graciously granted on January 11, 2016. (Dkt. 94.)

29.    The Parties thereafter reconvened on February 3, 2016 for a third full-day mediation session in Boca Raton, Florida. At this third session, Mapfre indicated that it was declining coverage. Following continued negotiations and a thorough analysis of Mapfre's position, Plaintiff and GMRS decided to continue to pursue their negotiations separately without Mapfre's involvement.

30.    By the end of the third session, counsel for the Parties were able to reach an agreement with respect to the framework of the settlement and the relief to be made available to the Settlement Class. Only once an agreement in principle was reached on the Class relief did the Parties negotiate Incentive Awards for the Class Representatives and attempt to negotiate the issue of reasonable attorneys' fees for Class Counsel.

31.    The attorneys' fees discussions, which lasted several weeks, were unsuccessful. The Parties agreed that Class Counsel should receive an award of some amount of reasonable attorneys' fees. They were unable, however, to agree on an amount that would be considered reasonable or to let the mediator make a proposal. As such, the Parties ultimately agreed to leave the amount of reasonable attorneys' fees to be decided by the Court (through a binding decision that neither party may appeal).

32.    The Parties then worked to finalize the Settlement documents and to present them to the Court for preliminary approval. The Court granted preliminary approval on March 29, 2016.

**Class Counsel'*s Work in the Case Since Preliminary Approval*

8

33.     The firms comprising Class Counsel have been required to invest substantial time finalizing the Settlement Agreement and shepherding the agreement through the approval process. Over five thousand (5,000) Settlement Class Members have filed claims, and Class Counsel has spoken with hundreds of Settlement Class Members regarding the settlement, their rights under the agreement, and about the TCPA more generally. Much of this time has been spent educating consumers about the TCPA and the way in which it protects them from unauthorized cellphone and other calls and advising Class Members of their rights specifically under the Settlement Agreement. Class Counsel has also assisted Settlement Class Members with the filing of claims.

34.     The administrator has informed me that the Class Notice was mailed directly to over four hundred thousand people, and, with over 70 million internet impressions, and that notice has effectively reached over 72% of the Settlement Class. As the Notice lists my firm's phone number, our office has received an onslaught of calls and inquiries. My firm has hired additional part-time help in order to ensure that all Settlement Class Members who call our office are responded to promptly. We are committed to continuing to field and respond to such inquiries.

35.     Additionally, GMRS has served discovery seeking Class Counsel's time records and other billing information. Moments before the Settlement was to be executed, GMRS's counsel demanded that GMRS be allowed to take such discovery. Rather than allow yet another late change to the documents, the Parties agreed that GMRS could seek permission from the Court for leave to serve such discovery and that Plaintiffs would object to such discovery if it were allowed. GMRS's counsel went ahead anyway and, notwithstanding the stay of the case called for under the Settlement (*see* Settlement Agreement § 10.17), propounded fees-related

discovery. The Class Representatives and Class Counsel object to such discovery, which is premature, unnecessary, and disproportional. GMRS should review the motion for fees and then determine what, if any, discovery it needs—there is no reason to allow GMRS wide-ranging fees discovery prior to GMRS even reviewing the motion for fees.

36.     To the extent the Court determines that it wants to review Class Counsel's time entries, Class Counsel is readily able to provide such time entries for *in camera* review. Class Counsel also plans on making the time sheets available to GMRS's counsel subject to GMRS's counsel agreeing to keep and treat the billing records as Confidential (and to only file them, if at all, under seal). No other discovery should be permitted as it is unnecessary, burdensome, and disproportionate to the needs of the fee issue and the case.

**GMRS's Novel Arguments**

37.     Much of the time expended in this case was the direct result of GMRS's myriad defenses, many of which were unprecedented and all of which required substantial attorneys' time and effort to refute and disprove. A description of each argument follows. In each instance, GMRS was unable or unwilling to substantiate its position, and Class Counsel was required to disprove GMRS's assertions.

38.     **GMRS Repeatedly Argued that It was Allowed to Obtain *Prior* Express Consent to Call Under the TCPA *After* the Phone Calls Were Made.** Despite the TCPA's requirement that companies who make autodialed calls to cellphone numbers obtain the called party's "prior express consent" before making the calls, GMRS asserted that it obtained express consent *after* the call was made. GMRS objected to discovery on the grounds that the entire proceeding was defeated by its defense of prior express consent. According to GMRS, cellphone users gave consent when they refused to hang up on GMRS's operators and, instead, participated

in GMRS's political surveys. But simply because certain people are too polite to hang up on GMRS's operator does not mean they consented to being called—let alone that such consent could be considered *prior* express consent. Indeed, under GMRS's reading, prior is deleted from the TCPA. Class Counsel requested that GMRS provide any support for this theory, but it failed to do so, leaving us to research the case law from scratch to determine whether anyone had ever raised such an argument. Class Counsel's exhaustive legal research revealed no such case, though the point is that GMRS's unsupported and unprecedented position necessitated such work.

39.    **GMRS Also Repeatedly Argued that *Implied* Consent Satisfied the Requirements of Prior *Express* Consent.** GMRS also repeatedly asserted that the cellphone users who it called had given express consent by virtue of the fact that they had listed their cellphone numbers when they had registered to vote. GMRS obtains its list of persons to call from voter registration rolls. Yet despite the fact that no voters expressly authorize GMRS to call them at all, let alone with an autodialer, GMRS claimed that consent may be implied to call all such voters from their inclusion of their cellphone numbers on their voter registrations. But the statute specifically requires prior *express* consent. Class Counsel had to invest time refuting this "implied consent" defense as well.

40.    **GMRS Disputed that it Used an ATDS By Asserting—For the First Time in Any Federal Case Class Counsel Has Been Able to Locate—that After it Placed an Auto-Dialed Call, it Had a "Live" Operator Join the Line.** GMRS also insisted that it did not use an ATDS because, once the call was connected, a live person would be available to speak with the called party, not simply a pre-recorded voice. But the TCPA has different prohibitions for pre-recorded voice calls and calls made with an ATDS. GMRS's approach treats them the same and,

given GMRS's refusal to provide support, required Class Counsel to research the issue anew, as opposed to being able to review GMRS's authority and refute it.

41.     **GMRS Asserted That the TCPA Was Unconstitutional, Which Plaintiffs' Counsel Had to Investigate Before the DOJ Intervened to Defend the Statute Against GMRS's Claims.** GMRS also claimed that the TCPA is unconstitutional, and Class Counsel was required to research and defend the constitutionality of the Act prior to the intervention in the *Zilveti* and *Thompson* matters by the Department of Justice in September/October 2015. At that point, Class Counsel worked closely with counsel for the United States, Jean-Michel Voltaire, to defend the statute. The *Zilveti* Court ultimately rejected GMRS's arguments attacking the TCPA's constitutionality.

42.     **GMRS Refused to Provide Relevant Information In Discovery Regarding the Identities of Its Third-Party Clients Who Hired it to Make the Calls at Issue, Thereby Necessitating Two Motions to Compel.** GMRS objected to Plaintiffs' discovery requests seeking the identities of its third-party clients on the grounds that it would cause GMRS financial ruin. This is despite the fact that such persons had relevant information regarding GMRS's consent defense—GMRS asserted that its clients had obtained such consent—and could have had potential liability to the Settlement Class Members. GMRS also objected on the supposed basis that such information was proprietary and privileged from disclosure. This required additional research and meet and confers in attempts to resolve such issues. Such efforts were unfruitful, however, as GMRS refused to provide the information (or further discuss the need for it), necessitating Plaintiffs' First and Second Motions to Compel (which the Court granted in large

12

part and ordered that GMRS disclose the information, thus prompting the return to mediation).

(Dkts. 49, 64, 84.)[1]

43.     **Despite the Fact the Case was Initially Pled as a Nationwide Class Action, GMRS Refused to Provide Discovery Responses For any Out-of-State Surveys Apart From the Surveys for Which the Named Plaintiffs Were Called and Then Moved For Sanctions When Out-of-State Cases were Filed.** GMRS objected to providing discovery responses for any surveys involving states apart from the states where the named Plaintiffs reside, despite the fact that the case was plead as a nationwide class action. According to GMRS, only persons who were called in the States where first Plaintiff Walsh, and subsequently Plaintiffs Martin and Armstrong, resided at the time the calls were made had "substantially similar" claims so as to warrant any discovery into such "out-of-state" political surveys. Plaintiffs disputed this, but GMRS stood on its objections.

44.     This forced Class Counsel to take two actions. First, following attempts to meet and confer, Class Counsel moved the Court to compel the disclosure of such information.

45.     Second, and to protect against the (unlikely but still fairly possible) event that the Court agreed with GMRS and restricted such discovery, Class Counsel worked to file the *Zilveti* and *Thompson* matters. Those cases would not have been brought had GMRS withdrawn its

---

[1] Magistrate Judge Spaulding denied Plaintiffs' first motion to compel without prejudice (dkt. 51) in part on the grounds that the Parties needed to complete their obligation to meet and confer (GMRS had declined to meet and confer following the first mediation). Following additional meet and confers, when GMRS stood on most of its objections, Plaintiffs filed their Second Motion to Compel (dkt. 64), which the Court granted on October 15, 2015. (Dkt. 84.)

13

objection to the out-of-state surveys, and all of the work that went into prosecuting them was due to GMRS's refusal to budge in this regard.[2]

46.    **GMRS Demanded the Medical Records of Ms. Armstrong's Father.** In response to Plaintiff Kristin Armstrong's allegation that the calls were invasive because she acts as caretaker for her father, who suffers from a debilitating medical condition, GMRS sought her father's complete medical files in discovery. This required Class Counsel to research the obligation of a party to produce non-party medical records when the claim at issue in the case does not rest on the medical condition and the discovery appears burdensome and disproportionate to the needs of the case. This request created extra work for Class Representative Armstrong and for Class Counsel.

47.    **GMRS Named Congressional Representatives and FCC Commissioners and Chairpersons as Potential Witnesses to Testify Regarding the Legislative History of the TCPA.** GMRS also created work through its Rule 26(a)(1) disclosures by naming as potential witnesses several current and former members of Congress, as well as current members of the Federal Communications Commission. All such individuals were to ostensibly testify as to the legislative intent behind the TCPA. This required research regarding the scope of permissible Rule 26(a)(1) disclosures as well as the propriety of calling members of Congress as witnesses

---

[2] GMRS filed an unsuccessful motion for sanctions against Class Counsel, which was fully briefed before being denied by the Court in an order that indicated that Plaintiffs' Counsel had leave to seek sanctions against GMRS via a separate motion. (Dkt. 56.) Plaintiffs' Counsel thereafter moved for sanctions (dkt. 61) which was ultimately denied but not before the Court stated that GMRS's counsel had behaved unprofessionally in at least two respects and indicated that more appropriate conduct was expected going forward. (Dkt. 65.) Such motion practice required yet additional work by Class Counsel.

regarding legislative intent—which appears to be unconstitutional.[3] Class Counsel's research was unable to locate any other attempt by any litigant to prove Congressional intent through the in court testimony of members of Congress. In no case has any Court of Appeal that Class Counsel could locate ever allowed for the testimony of members of Congress under similar circumstances and GMRS never provided Class Counsel or the Court with any. Nevertheless, this was another issue that required research and other attorneys' time.

48.    **GMRS Named Other Witnesses Who Had No Knowledge of Any Facts Related to the Case.** GMRS also named The Civitas Institute in its Rule 26(a)(1) disclosures, but it ignored requests to explain what The Civitas Institute is or specify what knowledge it may have had regarding the case. As a result, Class Counsel issued a third-party subpoena to Civitas. Class Counsel thereafter engaged in communications with the head of the Civitas Institute who was unable to explain what information Civitas may have had that is relevant to GMRS. This also required extra work on Class Counsel's part.

49.    **GMRS Filed Multiple Motions to Reconsider, Often Claiming that the Court "Overlooked" or "Failed to Consider" its Arguments, Even When No Such Arguments Were Even Raised.** Extra attorneys' time was required in this case to address GMRS's several "motions for reconsideration," several of which suggested the Court had "overlooked" GMRS's arguments. These briefs included:

> • On January 23, 2015, GMRS filed a "renewed" motion to strike certain allegations which re-asked the Court to reconsider GMRS's arguments that the class allegations should be stricken, even after the Court denied GMRS's initial motion to strike (dkt 17) on December 16, 2014 (dkt. 30.);

---

[3] *See* Art. I, s 6, cl. 1, of the Constitution ("The Senators and Representatives…shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; *and for any Speech or Debate in either House, they shall not be questioned in any other Place.*")

- On July 31, 2015, GMRS filed a Motion to Vacate and Reconsider Order allowing Plaintiff to file an Amended Complaint which argued that the Court, in allowing Plaintiffs leave to amend the complaint, "overlooked" GMRS's arguments—without disclosing to the Court that GMRS had actually failed to timely file its opposition to Plaintiffs' Motion for Leave to Amend, and, as such, the Court hadn't "overlooked" any arguments, GMRS had simply failed to raise them;

- In October 2015, GMRS requested oral argument on Plaintiffs' then-pending motion to compel and GMRS's motion for a protective order; the Court initially granted oral argument but then canceled when GMRS's counsel could not attend. GMRS thereafter filed a request for oral argument which was denied on October 8, 2015. GMRS then filed a motion to reconsider the denial of oral argument, which the Court denied the following day.

Such attempts to re-hash issues that had been previously decided resulted in increased work on certain motions and other issues. Even where the Court acted quickly, Class Counsel performed research and began preparing responses. Class Counsel's lodestar reflects such time accordingly.

50.     **GMRS's Insurer Insisted That a Florida State Case Supported GMRS's Settlement Position And Requested That Class Counsel Pull and Review the State Court File—Class Counsel Did So, And The File Showed That Class Counsel's Position, Not GMRS's Position, Was Supported by the Case.** During the negotiations, GMRS's insurer indicated that GMRS wanted a term in the Settlement Agreement that would allow it to terminate the agreement if a certain condition was met. Class Counsel indicated that they had never heard of such a term or seen it used, but suggested that GMRS's insurer was mistaking its proposed term with another commonly used term (that would enable GMRS to terminate the agreement if the number of persons opting out exceeded a certain threshold). GMRS's insurer instructed Class Counsel to look up a Florida state court settlement. Class Counsel hired an investigator to pull the case file and to copy the settlement agreement. Class Counsel thereafter reviewed and analyzed the settlement. As suspected, the settlement in that matter reflected the commonly used term, which the Parties have incorporated into their Settlement, allowing the defendant in that case to terminate the agreement if a certain percentage of the class opted out or excluded

themselves—not the term the insurer's attorney had insisted was used. This created additional work for Class Counsel.

51.    **GMRS "Discovered" Additional Potential Insurance at the 11th Hour, Forcing a Third Full-Day Mediation Session.** As indicated above, GMRS learned on the eve of reaching an agreement that it supposedly had access to another $4 million in potential insurance. At the start of the mediation process, GMRS indicated that it only had $4,000,000 in potential insurance. This changed at the first mediation session where GMRS revealed that it had $6,000,000 in potential insurance. From the first mediation session throughout nearly all of 2015, Plaintiffs proceeded on the understanding that $6,000,000 was available, nothing more. GMRS's revelation that it also had a policy with Mapfre for the years 2010 and 2011 required additional time and work by Class Counsel, even though Mapfre ultimately decided to decline coverage. Indeed, the mediator required that Class Counsel attend a third mediation session, which required additional time and expenses preparing for and traveling to Florida to negotiate further terms. This would not have been necessary had GMRS adequately disclosed and pursued its available insurance.

52.    **GMRS Demanded that it be Allowed to Serve Discovery Related to Attorneys' Fees.** After the Parties reached an agreement in principle on the relief to be made available to the Settlement Class, counsel for the Parties began negotiating the issue of reasonable attorneys' fees. After weeks of back-and-forth with the mediator it became apparent that the Parties were not going to agree on an amount for reasonable fees, and instead they agreed that the issue of determining the amount of a reasonable fee would be left for the Court to decide. No other settlement terms were affected, including the term set forth in Section 10.17 that indicates the Parties agree that the litigation will be stayed following preliminary approval.

17

53.     In contravention of this provision, GMRS's counsel indicated on the day before the Settlement Agreement was set to be executed and filed that its counsel wanted to insert a provision giving GMRS the ability to conduct discovery related to Class Counsel's contemplated motion for reasonable attorneys' fees. Because fees are not supposed to result in a second round of litigation, Class Representatives and Class Counsel objected to such a term as being unnecessary and premature. Class Counsel instead stated that GMRS remained able to ask the Court for leave to conduct such discovery if the Court determined it was necessary. GMRS indicated it agreed.

54.     Notwithstanding this apparent agreement, on June 8, 2016, GMRS served document requests and interrogatories on Class Counsel seeking all billing records in the case together with a host of other documents and materials. Such discovery is not needed in light of the level of detail set forth in the instant fee petition. Nevertheless, to the extent such discovery is allowed, it will add more time and expense to the case. Indeed, it is for this reason that discovery is rarely permitted in connection with fee motions. *See Manual for Complex Litigation, Third* § 24.224; *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 338 (3d Cir. 1998)**;** *In re Diet Drugs*, 582 F.3d 524, 538 (3d Cir. 2009); *Powell v. Coombs*, 122 F.3d 1057 (2d Cir. 1995).

**Class Counsels' Lodestar, Experience, and Other Considerations**

55.     When added to the work typically required in a nationwide class action that requires multiple motions to compel, GMRS's novel positions have resulted in a meaningful lodestar for Class Counsel.

56.     Pursuant to our firm's billing protocol, attorneys at our firm enter their billing regularly using our "Freshbooks" system. Time was entered in this case in accordance with our

firm's billing protocol and has been reviewed to delete any time misspent, any duplication of effort, and for any other entries for which there was insufficient justification. As stated in the Motion for Attorneys' Fees, Class Counsel stands willing to provide the Court with billing records for *in camera* review and will provide copies to GMRS for treatment as "CONFIDENTIAL."

57.     As of the time of filing, my firm's lodestar is reflected in the following chart:

| Attorney Name/Firm | Position | Rate | Hours | Lodestar |
|---|---|---|---|---|
| Steven Woodrow/ Woodrow & Peluso | Partner | $430 | 1,026.2 | $441,266.00 |
| Patrick Peluso/ Woodrow & Peluso | Partner | $330 | 884.4 | $291,852.00 |
| Law Clerk Rate/WP | Paralegal | $100 | 13.2 | $1,320.00 |
| **CURRENT LODESTAR** | | | 1,923.8 | $734,438.00 |

58.     Such time is meaningful and was dedicated to work that advanced the litigation and Settlement. We took this matter on a contingency with no guarantee of payment. Indeed, the law on the TCPA is not entirely settled, and even judgments at trial are reversed on appeal. At the onset of this case, several questions remained regarding the ability of companies like GMRS to make autodialed calls to cellphone users. We also had no reason to know that GMRS had any insurance at all. We also spent substantial time on the case and were necessarily precluded from working on other potential class actions (in addition to doing more work for the firm's paying clients).

59.     As shown in the attached Firm Resume, our firm, Woodrow & Peluso, LLC, routinely litigates nationwide class actions under the Telephone Consumer Protection Act. Litigating such cases requires both knowledge of the substantive law—the TCPA—as well as of class action practice and procedure. We brought that skill to bear in this case, which included

preparing all pleadings and filings, as well as achieving the instant Settlement. Our lawyers have significant experience litigating such cases and do so with an eye for proceeding in a way so as to maximize efficiency and minimize waste. Indeed, as we take the cases on a contingent basis, we have no incentive to perform work that is anything other than productive and efficient.

60.    The instant Settlement, while on the low-end of the range of TCPA settlements when analyzed on a "per claim basis," and while the claims rate is low (presently approximately 1%), represents a positive result for the Class. Additionally, it should be noted that the $10,000,000 fund will be sufficient to cover the claims actually filed, the costs of Notice and administration (which may exceed over $400,000), the Class Representative Incentive Awards ($5,000 each), and the proposed Class Counsel's award of reasonable attorneys' fees. And, $15 is only "low" when judging the Settlement against settlements reached with billion dollar companies like 20th Century Fox, Sallie Mae, Bank of America, and Capital One. GMRS is, by comparison, a relatively small marketing firm whose primary assets are its Old Dominion insurance policies. Furthermore, it was GMRS's insurer who refused to agree to an additional $5 per person, because it would have resulted in $3,442,500 of additional exposure.

61.    Second, and perhaps more importantly, GMRS has completely revamped its system so as to filter out cellphone numbers and isolate them for manual dialing. And the Settlement allows consumers to opt out of having GMRS ever call them again.

62.    Additionally, my firm's rates are consistent with the market for reasonably comparable practitioners in the Middle District of Florida geographic area. My research indicates that rates ranged five years ago from $310 to $430,[4] and Plaintiff's counsel's rates fall within the

---

[4] *See Holman v. Student Loan Xpress, Inc.*, 778 F. Supp. 2d 1306, 1310 n.3 (M.D. Fla. 2011) (finding five years ago that "an hourly rate that aligns with the average partner billing rate at a

values typically awarded. I've also spoken with attorney John Yanchunis who has indicated that our firm's rates are consistent with the rates charged for class action practitioners in the Middle District of Florida. ("Report of Attorney John Yanchunis," ¶ 18.) These are the rates we charge to paying clients for whom we do hourly work, and they are lower than the rates that Courts approved for me when I was a partner at my prior firm.[5]

63.     As such, my firm expended a total of 1,923.8 hours for a lodestar of $734,438.

64.     Going forward, the firms comprising Class Counsel estimate that between $50,000 and $75,000 of additional attorneys' time will be required to finalize the Settlement. Class Counsel projects this will bring the final lodestar between $1,096,153 and $1,121,153 (this is in addition to Counsel's current expense tally of $28,427.14).

**Class Counsel's Relationship with the *Class Representatives***

65.     As will be explained in papers filed in support of final approval, the prosecution of this matter benefitted substantially from the participation and effort of the four (4) Class Representatives. Plaintiff's counsel has not previously represented Martin, Armstrong, Thompson or Zilveti and does not have an on-going relationship that would warrant a discount based upon familiarity. Following the end of this litigation, it is unlikely that the unnamed plaintiffs will serve as repeat clients to class counsel.

66.     Given the temporary nature of the professional relationship as well as the lack of close ties between class counsel and the representatives, this is not the type of case where

---

leading firm in the Middle District of Florida ($310 to $435) will more than adequately compensate class counsel") (citing *Campbell v. Green,* 112 F.2d 143, 144 (5th Cir. 1940)).

[5] *See e.g. Wigod v. Wells Fargo Bank, N.A.*, Case No: 1:10-cv-2348 (N.D. Ill. 2014) (*Wigod* Dkt. 278)) (approving hourly rate of $570 for my work in 2014); *see also Schulken v. Washington Mutual Bank*, No. 09-CV-02708-LHK (N.D. Cal.) (*Schulken* Dkt. 223) (Judge Koh approving my former hourly rate of $500 in 2012). I reduced my rates when starting my own law firm to reflect the realities that larger firms command higher rates in the market.

Plaintiff's counsel would have litigated the case pro bono. Instead, Plaintiff's counsel took the case on a contingency basis in the hope that some amount of attorneys' fees would be recovered.

**My Firm's Expenses**

67.    As shown in the attached Expenses Report, my firm expended a total of $5,310.65 prosecuting the case. This included filing fees, travel expenses, and other charges related to the three cases. These expenses are reasonable and have been reviewed to ensure that any non-compensable charges have been removed. These expenses are in addition to our co-Counsel's expenses, which we understand to be $23,116.49, representing a total for expenses equal to $28,427.14.

68.    In Class Counsel's opinion, the Settlement represents a strong result for the Settlement Class and Class Counsel should receive a fee representing 30% of the Settlement Fund, or $3,000,000.

Further affiant sayeth not.

//

//

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in Denver, Colorado, on July 1, 2016.

/s/  Steven L Woodrow
Steven L. Woodrow

22

# EXHIBIT 1

<u>W<small>OODROW</small> & P<small>ELUSO</small>, LLC F<small>IRM</small> R<small>ESUME</small></u>

W<small>OODROW</small> & P<small>ELUSO</small>, LLC ("Woodrow & Peluso" or the "firm") is a plaintiff's class action and commercial litigation firm based in Denver, Colorado. The firm files cases across the Country.

Our attorneys have over a decade of experience successfully representing consumers and small businesses in matters nationwide. From litigation under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*., to cases enforcing the rights of job applicants and employees under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*., to appeals of first impression, our lawyers have litigated and favorably resolved numerous legal disputes to the satisfaction of our clients. At Woodrow & Peluso, LLC, we take special pride in the quality of our work product and strive tirelessly to achieve the best results for every client. Descriptions of our three primary practice areas—(1) Consumer Class Actions, (2) Commercial Litigation, and (3) Appeals—and key personnel follow.

O<small>UR</small> P<small>RACTICE</small> A<small>REAS</small>

**1.    <u>C<small>ONSUMER</small> C<small>LASS</small> A<small>CTIONS</small></u>**

The majority of the firm's caseload focuses on consumer class actions. These cases include class actions alleging violations of statutes, such as the Fair Credit Reporting Act, the Telephone Consumer Protection Act, and the Truth-in-Lending Act, as well as class actions challenging systematic breaches of contract and advancing other common law theories.

**TCPA Class Actions**

Since opening the firm's doors, Woodrow & Peluso attorneys have focused on litigating class actions challenging violations of the Telephone Consumer Protection Act. To date we have filed, prosecuted, and resolved using various settlement models TCPA cases against major corporations and entities including J.B. Hunt, Altisource, Acurian, Price Self Storage, Local Lighthouse, Global Marketing Research Services, Geekatoo, and the University of South Carolina, among others. Our firm's attorneys have substantial experience prosecuting such claims, including class actions challenging the unlawful transmission of text messages, the sending of unlawful facsimiles, the placement of "robocalls" featuring a pre-recorded voice to residential landline phones, and the use of automatic telephone dialing systems, including predictive dialers, to call consumer cell phones.

Notable TCPA cases and settlements include:

• *Martin et al. v. Global Marketing Research Services, Inc*., 6:14-cv-1290-ORL-31-KRS (M.D. FL) (Woodrow & Peluso appointed co-lead Settlement Class Counsel in settlement creating $10 million fund for class of 688,500 cellphone users) (preliminary approval granted March 29, 2016);

• *Mendez v. Price Self Storage Management, Inc*., 3:15-cv-02077-AJB-JLB (S.D. CA) (Woodrow & Peluso appointed co-lead Settlement Class Counsel in TCPA settlement

providing option of $750 cash or $1,100 in storage certificates) (preliminary approval granted (May 13, 2016).

Further, while a Partner with his prior law firm, Woodrow & Peluso attorney Steven Woodrow was appointed interim co-lead class counsel in a TCPA class action against Nationstar Mortgage, LLC (*see Jordan et al v. Nationstar Mortgage LLC*, 3:14-cv-00787-WHO) and led TCPA litigation that resolved favorably against Bankrate Inc., and Carfax.com. Mr. Woodrow was also involved in the TCPA settlement reached in *Weinstein v. The Timberland Co. et al.* (N.D. Ill.), a text messaging class action featuring 40,000 unauthorized messages, and was part of the appellate strategy team that secured the landmark decision in *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009), the first federal appellate decision to affirm that text messages are covered as "calls" under the TCPA.

### FCRA Class Actions

The second sub-focus within the firm's class action practice consists of cases under the Fair Credit Reporting Act ("FCRA"), which regulates the procurement and use of consumer reports by employers when they make hiring/firing/pay decisions. To date, the firm has successfully represented clients in putative class actions against Terminix, ServiceMaster, TrueBlue Inc./Labor-Ready Mid-Atlantic, FedEx, Tyler Staffing Services, Inc., Great Lakes Wine & Spirits, World Emblem, Inc., Freeman Webb, Inc., and others.

### Banking and Financial Institutions Class Actions

Our attorneys have substantial experience representing consumers in class action litigation involving national banking associations and other financial institutions. Meaningful representations include:

- *Schulken v. Washington Mut. Bank*, No. 09-CV-02708-LHK, 2012 WL 28099, at *15 (N.D. Cal. Jan. 5, 2012). Attorney Steven Woodrow secured prior firm's appointment as Class Counsel from Judge Lucy Koh in class action challenging JPMorgan Chase Bank, N.A.'s suspension of former WaMu home equity line of credit accounts. Case settled with Mr. Woodrow's appointment as co-lead settlement class counsel.

- *In re JPMorgan Chase Bank, N.A. Home Equity Line of Credit Litigation*, MDL No. 2167. Attorney Steven Woodrow helped secure transfer by the Judicial Panel on Multidistrict Litigation to the Northern District of Illinois and appointment of prior firm as interim class counsel. Attorney Woodrow also negotiated and was also appointed co-lead settlement class counsel in settlement projected to restore between $3 billion - $5 billion in credit to affected borrowers in addition to cash payments.

- *Hamilton v. Wells Fargo Bank, N.A.*, 4:09-cv-04152-CW (N.D. Cal.). Attorney Steven Woodrow served as co-lead settlement counsel in class action challenging Wells Fargo's suspensions of home equity lines of credit. Nationwide settlement restored access to over $1 billion in credit

and provided industry leading service enhancements and injunctive relief.

- *In re Citibank HELOC Reduction Litigation*, 09-CV-0350-MMC (N.D. Cal.). Attorney Steven Woodrow was appointed interim co-lead counsel and settlement class counsel in class actions challenging Citibank's suspensions of home equity lines of credit. The settlement was estimated to have restored over $650,000,000 worth of credit to affected borrowers.

- *Vess v. Bank of America, N.A.* 10cv920–AJB(WVG) (S.D. Cal.). Attorney Steven Woodrow negotiated class action settlement with Bank of America challenging suspension and reduction of home equity lines of credit.

- *Wigod v. Wells Fargo*, No. 10-cv-2348 (N.D. Ill.). Steven Woodrow secured the first appellate decision in the country recognizing the right of homeowners to sue under state law to enforce HAMP trial plan agreements. Attorney Steven Woodrow was appointed co-lead settlement counsel providing loan modifications and cash payments to affected borrowers.

### General Consumer Protection Class Actions

Woodrow & Peluso attorneys have additionally successfully prosecuted and resolved countless class action suits against other companies for a range of consumer protection issues. For example, Woodrow & Peluso filed the first class action in the Country to challenge the marijuana industry's use of certain allegedly dangerous fungicides and pesticides and were the first lawyers to bring class actions (against the Colorado Rockies Baseball Club and Kroenke Sports & Entertainment, LLC) seeking to enforce the Colorado Consumer Protection Act, § 6-1-718 *et seq.*, which prohibits owners of entertainment venues from imposing restrictions on the resale of tickets. The firm has also brought and litigated class actions against hospitals for their use of "chargemaster" billing rates and are presently engaged in litigation against Southwest Airlines related to its "Companion Pass" program.

Woodrow & Peluso LLC has also brought claims against major food manufacturers and distributors for falsely advertising certain products as "All Natural" and "Made in U.S.A." Our attorneys also have experience litigating class claims regarding missing or misappropriated "bitcoins." Woodrow & Peluso also brought the first class action in Colorado against cannabis growers for their use of unapproved and harmful pesticides.

### 2.    COMMERCIAL LITIGATION

As small business owners, we understand and appreciate the challenges that new companies face as they strive to make headway in the market. Our attorneys regularly counsel small businesses and have represented such companies in a wide range of general commercial litigation matters including partnership and business disputes, breaches of contracts and term sheets, and claims charging company managers and members of breach of fiduciary duty, breach of contract, fraud, and fraudulent/preferential transfer. We regularly advise clients on matters and

contracts involving millions of dollars, and our attorneys have successfully represented businesses and other entities in mediations, arbitrations, and trial.

3.   APPEALS

Our attorneys have substantial experience handling appeals at both the state and federal level. Representative appeals worked on predominately by our attorneys include:

- *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012). Attorney Steven Woodrow briefed and argued this appeal resulting in the first federal appellate decision holding that banks may be sued under state law for violations of the federal government's Home Affordable Modification Program. The opinion has been cited over 1,300 times by courts, litigants, and commentators throughout the Country and is widely regarded as the leading authority on the rights and obligations of HAMP servicers and borrowers.

- *Robins v. Spokeo*, 742 F.3d 409 (9th Cir. 2014). Attorney Steven Woodrow argued a federal appeal reversing dismissal and upholding consumer rights under the Fair Credit Reporting Act against one of the nation's largest online data aggregators regarding whether a plaintiff who does not suffer tangible pecuniary loss may still show legal harm to satisfy Article III standing. The case is currently pending before the United States Supreme Court and has been frequently reported on as one of three major class action issues presently on the Supreme Court's docket.

- *Equity Residential Properties Mgmt. Corp. v. Nasolo*, 364 Ill. App. 3d 26, 28, 847 N.E.2d 126, 128 (2006). Attorney Steven Woodrow helped author the winning brief in this landmark landlord/tenant appeal defining the requirements for constructive service and due process for Illinois evictions under the Illinois Forcible Entry and Detainer Act. 735 ILCS 5/9–107 *et seq*.

- *Fuentes v. Kroenke Sports & Entertainment, LLC*, Case No. 2014CV32619. Woodrow & Peluso appealed grant of summary judgment in favor of defendant finding that the Colorado Consumer Protection Act, 6-1-701 *et seq.* does not allow for class actions. Case settled prior to the resolution of the appeal.

### OUR ATTORNEYS

At present, our firm consists of 2 attorneys whose relevant experience is set forth below.

**STEVEN LEZELL WOODROW** has over a decade of experience advising consumers and small businesses in high stakes litigation.

Steven briefed and delivered the winning argument in the landmark federal appellate court decision *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012) holding banks accountable for violations of the federal Home Affordable Modification Program. The opinion is widely regarded as the leading authority on the rights and obligations of HAMP servicers and borrowers. Steven also delivered the winning oral argument in *Robins v. Spokeo*, 742 F.3d 409 (9th Cir. 2014), a federal appeal upholding consumer rights under the Fair Credit Reporting Act against one of the nation's largest online data aggregators. The case is presently set for argument before the United States Supreme Court.

Mr. Woodrow was appointed lead class counsel in litigation against JPMorgan Chase Bank, N.A. challenging the bank's 4506-T HELOC suspension program and was appointed lead settlement class counsel in other HELOC suspension litigation against Wells Fargo Bank, N.A., Citibank, N.A., Chase, Bank of America, N.A. and PNC Bank.

Mr. Woodrow also led the legal team that secured a preliminary injunction freezing the U.S. assets of Mark Karpeles, the former head of the failed Bitcoin exchange known as Mt. Gox, as well as an order compelling Mr. Karpeles to personally appear in the United States for a deposition in connection with Mt. Gox's Chapter 15 bankruptcy case in Dallas Texas.

Steven has also litigated putative class actions under the Telephone Consumer Protection Act, and courts have appointed him to serve as class counsel in nationwide settlements against cellphone companies, aggregators, and mobile content providers related to unfair billing practices, including *Paluzzi v. Cellco Partnership*, *Williams v. Motricity, Inc.*, and *Walker v. OpenMarket Inc.*

Steven has also served as an Adjunct Professor of Law at the Illinois Institute of Technology Chicago-Kent College of Law, where he co-taught a seminar on class actions. Prior to founding Woodrow & Peluso, Steven was a partner at prominent class action technology firm in Chicago.

Before that, he worked as a litigator at a Chicago boutique where he tried and arbitrated a range of consumer protection, landlord tenant, and real estate matters.

**EDUCATION**
Chicago-Kent College of Law, J.D., High Honors, 2005
The University of Michigan—Ann Arbor, B.A, Political Science, *with Distinction*, 2002

**ADMISSIONS**
State of Colorado (2011)
State of Illinois (2005)
United States Court of Appeals for the Seventh Circuit
United States Court of Appeals for the Ninth Circuit
United States District Court, District of Colorado
United States District Court, Northern District of Illinois
United States District Court, Eastern District of Michigan

United States District Court, Western District of Michigan

**PATRICK H. PELUSO** specializes in plaintiff-side consumer class actions.

With a true passion for protecting consumers and their rights, Patrick aggressively pursues class action lawsuits against companies who violate those rights.

Through these lawsuits, he is able to force law-breaking companies to compensate the people they have harmed and correct their future practices. Patrick possesses the skills, strategic vision, and moxie to achieve excellent results for the people he represents. He has experience working with a broad range of consumer protection laws including the Fair Credit Reporting Act, the Telephone Consumer Protection Act, and various state consumer protection and consumer fraud statutes.

Patrick received his law degree from the University of Denver, Sturm College of Law where he was Editor-in-Chief of an academic journal. During law school, Patrick worked with a leading consumer class action law firm and held legal internships with a federal administrative judge and the legal department of a publicly traded corporation. Before law school, Patrick attended New York University, where he graduated with a B.S. and played on the school's club baseball team.

Patrick grew up in Baltimore, Maryland and now resides in Denver, Colorado.

**EDUCATION**
University of Denver, J.D. 2014
New York University, B.S.

**ADMISSIONS**
State of Colorado (2014)
United States District Court, District of Colorado

# EXHIBIT 2

# Woodrow & Peluso LLC

## Expense Report GMRS

| Date | Type of Expense | | Amount |
|---|---|---|---|
| 4/1/2015 | Car Rental Fee - GMRS Mediation | $ | 60.75 |
| 4/1/2015 | Hotel rooms - GMRS Mediation | $ | 416.98 |
| 4/1/2015 | Airfare - GMRS Mediation | $ | 528.40 |
| 4/23/2015 | Airport Parking - GMRS Mediation | $ | 48.00 |
| 4/23/2015 | Food Purchases - GMRS Mediation | $ | 13.40 |
| 6/4/2015 | Zilveti v. GMRS - Filing Fee | $ | 400.00 |
| 6/17/2015 | Zilveti v. GMRS - Pro Hac Vice Fees | $ | 610.00 |
| 6/17/2015 | Zilveti v. GMRS - Process Service Fees | $ | 40.00 |
| 6/29/2015 | Thompson v. GMRS - Pro Hac Vice Fees | $ | 40.00 |
| 7/14/2015 | Thompson v. GMRS - Process Service Fees | $ | 35.00 |
| 7/15/2015 | Thompson v. GMRS - Local Counsel Invoice | $ | 1,186.05 |
| 8/18/2015 | Process Service Fees - Subpoena to Civitas | $ | 115.00 |
| 8/19/2015 | Thompson v. GMRS - Courtesy Copies to Judge | $ | 34.91 |
| 8/21/2015 | Thompson v. GMRS - Local Counsel Invoice | $ | 344.50 |
| 9/11/2015 | Thompson v. GMRS - Courtesy Copies to Judge | $ | 41.34 |
| 9/30/2015 | Airfare for Hearing - Not Reimburseable | $ | 229.00 |
| 10/19/2015 | Airfare - GMRS Mediation | $ | 218.60 |
| 10/22/2015 | Airport Parking - GMRS Mediation | $ | 27.00 |
| 10/22/2015 | Food Purchases - GMRS Mediation | $ | 5.68 |
| 10/28/2015 | Zilveti v. GMRS - Courtesy Copies to Judge | $ | 56.08 |
| 1/5/2016 | Process Service Fees - Subpoena to Tampa Bay DSI | $ | 107.00 |
| 1/31/2016 | Airfare - GMRS Mediation | $ | 578.36 |
| 2/5/2016 | GMRS Mediation - food purchases | $ | 39.60 |
| 2/23/2016 | Thompson v. GMRS - Local Counsel Invoice | $ | 135.00 |
| | **Total** | $ | 5,310.65 |

# EXHIBIT B - 2

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| ROBERT MARTIN and KRISTIN ARMSTRONG individually and on behalf of all others similarly situated, | Case No. 6:14-cv-1290-ORL-31-KRS |
| *Plaintiffs*, | CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| GLOBAL MARKETING RESEARCH SERVICES, INC., | |
| *Defendants*. | |

**DECLARATION OF STEFAN COLEMAN IN SUPPORT OF MOTION FOR**
**APPROVAL OF ATTORNEYS' FEES AND EXPENSES**

Pursuant to 28 U.S.C. § 1746, I, Stefan Coleman, Esq. hereby declare and state as follows:

1. I am over the age of eighteen and am fully competent to make this declaration. I make this declaration based upon personal knowledge unless otherwise indicated.

2. This declaration is made in support of Plaintiffs' Motion for Attorneys' Fees and Expenses in this matter.

3. I am the managing attorney of the Law Offices of Stefan Coleman, P.A., a boutique litigation firm focused on complex litigation matters, including specifically class action claims brought under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").

4. I have litigated dozens of TCPA matters during my career including a number of significant nationwide settlements.

5. I have been involved in the above captioned action from the outset, from an extensive pre-suit investigation through to its conclusion.

6. I began investigating this case, which ultimately led to this class action over 3.5 years ago.

Much of this time was spent interviewing consumers who contacted my office to complain regarding political survey calls they were receiving. From this in-depth investigation I was able to determine that GMRS was likely behind the calls, that it was using an autodialer, and that it was highly doubtful that it secured prior express consent as required under the TCPA. And since that time, I have aggressively pursued the rights and claims of the class members. Through the final approval hearing upcoming in August, 2016, this case will be fully litigated for the last 2 years.

7. I am familiar with (i) the claims, evidence, and legal arguments involved in this settlement, (ii) the terms of the class settlement, and (iii) the relevant defenses, evidence, and legal arguments. Based on my experience in having litigated dozens of TCPA matters and in settling significant nationwide class settlements, I believe that the settlement reached in this case is clearly in the best interest of the class members as it provides them with both meaningful relief and financial compensation for their claims.

8. In this case, my firm (and later co-counsel Woodrow & Peluso LLC) agreed to undertake this class action case on a contingent fee basis of up to 33%.

9. I knew from the outset that I would be required to spend potentially hundreds of hours investigating and litigating Plaintiffs' claims with absolutely no guarantee of success, while simultaneously foregoing other opportunities. Nevertheless, my firm has a proven record of effectively and successfully prosecuting complex nationwide class actions such as this one (*see* Firm Resume of Law Offices of Stefan Coleman, P.A., attached as Exhibit 1A), and I brought that same skill and tenacity to the class members in this case.

10. To date, my firm has spent 692.7 total hours representing the Plaintiffs and the Settlement Class without compensation.

2

11. Throughout my involvement in this case, I did my part to ensure that the tasks necessary to prosecute this case were appropriately allocated and conducted efficiently, without undue duplication of effort, and at minimal expense. Not being paid by the hour, I had an incentive to conduct my efforts efficiently. So too, being responsible for advancing expenses, I had an incentive to not expend funds unnecessarily.

12. As reflected in the table below, as of June 29, 2016, the total number of attorney hours spent on this case by my law office is 692.7 hours. The hours are notated on an ongoing basis and rounded to the nearest tenth of the hour. The total lodestar amount for my attorney time based on my current rate is $311,715. The lodestar figure is based on my ordinary professional billing rate of $450 that I charge clients, including those that pay for legal services by the hour and which have been consistently approved in Motions for Attorneys' Fees based on the lodestar method.  I have charged this $450 rate since 2013 and this rate has been accepted by every court in which I have submitted my loadstar, including within the Eleventh Circuit by the Honorable Donald M. Middlebrooks of the Southern District of Florida in *Lanza v. Upscale Events by Mosaic LLC, et al.,* who held that "The Court finds that the rates charged to be appropriate and reasonable in lights of the experience of each attorney and that the hourly rates are in line with comparable market rates."[1]  Since that time, my experience and skill in litigating class actions has only grown, yet I have maintained my then hourly rate of $450. My law firm resume is attached as Exhibit 1A.

| Attorney | Years of Experience | Hours | Rate | Total |
|---|---|---|---|---|
| Stefan Coleman | 9.5 | 692.7 | $450 | $311,715 |

[1] *Lanza v. Upscale Events by Mosaic LLC, et al.,* 9:13-cv-80093-DMM (S.D. Fla.) Order Granting Unopposed Motion for Final Approval of Class Action Settlement Agreement; Motion for Attorney's Fees, Expenses and Incentive Award; and Final Judgment ECF #128 (Filed 2/28/14)

| | | |
|---|---|---|
| **Total** | 692.7 | $311,715 |

13. Based on my experience with similar settlements, I anticipate that approximately 30
    additional hours will be required to be performed through final approval and administration
    of the settlement, should the Court approve it. My firm must still draft and edit a final
    approval motion, prepare and attend the Final Fairness Hearing, contend with any potential
    objections (including Defendant's opposition to the Motion for Attorneys' Fees and
    Expenses), and handle various issues related to claims administration.

14. In addition, my firm has incurred $23,116.49 in reimbursable expenses, which include filing
    fees and mediation fees.

15. I will continue to expend resources and time on this case in an effort to ensure that Class
    members receive the relief we made available to them under the Settlement.

I declare under penalty of perjury that the foregoing is true and correct.


        Executed, June 29, 2016                      /s Stefan Coleman_____
                                                      Stefan Coleman, Esq.

# EXHIBIT 1A

<u>LAW OFFICES OF STEFAN COLEMAN, P.A. RESUME</u>

<u>INTRODUCTION</u>

The Law Offices of Stefan Coleman, P.A. is a boutique class action law firm that concentrates its practice on consumer law and technology.  The core of the law firm is based on an in-depth knowledge of an ever-evolving technology and its impact on the law and consumers. Specifically, the firm has devoted much of its practice to protecting consumer privacy rights by the mechanism of the Telephone Consumer Protection Act as well as protecting consumers against product defects and deceptive advertising.  The firm also works on behalf of companies to alert them to the most recent changes and evolutions in the law as it applies to their industry. The firm is grateful to have litigated a number of significant class actions on behalf of consumers in its tenure.

<u>TELEPHONE CONSUMER PROTECTION ACT CASES</u>

- *In re Jiffy Lube,* a Telephone Consumer Protection Act case that resulted in a $35 million recovery for consumers for the unsolicited text message advertising. Several major issues of law were settled in this case resulting in a massive victory for consumers.

- *Pimental v. Google Inc.*, a Telephone Consumer Protection Act case that alleged that defendant co-opted group text messaging lists to send unsolicited text messages. $6 million settlement provided class members with an unprecedented $500 recovery.

- *Woodman v. ADP Dealer Services, Inc., et al.,* a Telephone Consumer Protection Act case that resulted in a $7.5 million settlement for consumers who received unsolicited text messages promoting car sales.

- *Lanza v. Palm Beach Holdings., et al.,* a Telephone Consumer Protection Act case that resulted in a $6.5 million settlement for consumers who received unsolicited text messages.

- *Kolinek v Walgreen, Co.* a Telephone Consumer Protection Act case that resulted in an $11 million settlement for consumers who received unsolicited calls to their cell phone.

- *Hopwood v. Nuance Communications., et al.,* a Telephone Consumer Protection Act case that resulted in a $9.24 million settlement for consumers who received unsolicited calls.

- *Flanigan v. The Warranty Group, Inc. and American Protection Plans LLC d/b/a American Residential Warranty.*, a Telephone Consumer Protection Act case that resulted in a $16 million settlement for consumers who received unsolicited calls.

- *Brown v. Rita's Water* Ice, a Telephone Consumer Protection Act case that resulted in a $3 million settlement for consumers who received unwanted text messages.

<u>PRODUCT LIABILITY AND FALSE ADVERTISING CLASS ACTIONS</u>

6

- *Love v. IdeaVillage Products Corp et al*, a consumer class action in which certain purchasers could recover a full refund for their purchase of an alleged defective product sold by the defendant.  This case resulted in the defendant changing its business practice.

- *Xexo v. iRenew Bio Energy Solutions et al*, a consumer class action in which purchasers of the iRenew bracelet recovered for the alleged false advertising by the defendant.

- *Oliver v. Funai Corporation, Inc. et al.,* a consumer class action currently in litigation seeking relief for those who purchased televisions made by Funai Corporation, Inc.

**GENERAL CONSUMER PROTECTION CLASS ACTIONS**

*Wornicki v. BrokerPriceOpinion, et al.,* a general consumer class action currently in litigation seeking back-pay for thousands of realtors who provided broker price opinions but who did not receive payment.

**STEFAN COLEMAN**

Stefan Coleman, Esq. is a graduate of the University of Virginia and the University of Miami School of Law.  He has practiced law for over nine years and a half years in which time he has participated in a number of significant class actions on behalf of consumers.  In addition, Stefan advises companies on their compliance and marketing guidance, as well as advising them on business development.

**EDUCATION**
University of Virginia, 2003
University of Miami, J.D. 2006
University of Miami, LLM 2007

**ADMISSIONS**
State of Florida (2006)
District of Columbia (2008)
State of New York (2009)
State of New Jersey (2009)

New Jersey State Court (2009)

New York State Court (2009)

Colorado District Court (2009)

Central District of Illinois (2009)

Northern District of Illinois (2009)

Southern District of Illinois (2009)

Southern District of New York (2009)

Northern District of New York (2009)

Western District of New York (2009)

New Jersey District Court (2009)

Northern District of Texas (2009)

District Court of Nebraska (2009)

Western District of Michigan (2009)

Eastern District of Wisconsin (2009)

7

Northern District of Florida (2009)
Middle District of Florida (2009)
Southern District of Florida (2010)

# EXHIBIT 1B

Law Offices of Stefan Coleman
201 S Biscayne Blvd, 28th Floor
Miami FL  33131



LAW OFFICES OF
STEFAN COLEMAN P.A.

Law Offices of Stefan Coleman                    Invoice #                            0001266
Stefan Coleman                                   Invoice Date                June 27, 2016

| Balance Due (USD) | $23,116.49 |
| --- | --- |

| Item | Description | Unit Cost | Quantity | Line Total |
| --- | --- | --- | --- | --- |
| Expense | [GMRS 03/24/16] Professional Services, UPCHURCH WATSON WHITE & MAX: Mediation's Fee Invoice #4 | 6,468.75 | 1 | 6,468.75 |
| Expense | [GMRS 01/04/16] Professional Services, UPCHURCH WATSON WHITE & MAX: Mediation Fee Invoice #3 | 4,240.62 | 1 | 4,240.62 |
| Expense | [GMRS 10/22/15] Legal Fees, UPCHURCH WATSON WHITE & MAX: Mediation fee Invoice #2 | 6,290.87 | 1 | 6,290.87 |
| Expense | [GMRS 05/27/15] Professional Services, UPCHURCH WATSON WHITE & MAX: Mediation Fee Invoice #1 | 5,606.25 | 1 | 5,606.25 |
| Expense | [GMRS 08/13/14] Professional Services, World Class Investigations, Inc.: Service on GMRS and Diana | 110.00 | 1 | 110.00 |
| Expense | [GMRS 08/11/14] Legal Fees, Court: Filing fee | 400.00 | 1 | 400.00 |

| | | |
| --- | --- | --- |
| **Total** | | **23,116.49** |
| Amount Paid | | 0.00 |
| **Balance Due (USD)** | | **$23,116.49** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT STUB

Law Offices of Stefan Coleman                    **Client**              Law Offices of Stefan Coleman
201 S Biscayne Blvd, 28th Floor                  **Invoice #**                            0001266
Miami FL  33131                                  **Invoice Date**                June 27, 2016

**Balance Due (USD)**                            $23,116.49

**Amount Enclosed**